**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NORTH CAROLINA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | )    DOCKET NO. 7:21-CR-135-1M |
| Plaintiff, | ) |
|  | ) |
| vs. | ) |
|  | ) |
| BRANDON MCMILLAN, | ) |
|  | ) |
| Defendant. | ) |

**TRANSCRIPT OF DETENTION HEARING**
**BEFORE MAGISTRATE JUDGE ROBERT B. JONES JR.**
**WEDNESDAY, DECEMBER 8, 2021; 10:31 AM**
**WILMINGTON, NORTH CAROLINA**

**FOR THE PLAINTIFF:**
United States Attorney's Office
By:  William Van Trigt, AUSA
316 Princess Street, Suite 543
Wilmington, North Carolina 28401

**FOR THE DEFENDANT:**
Ludlum Law Firm
By:  Hayes Ludlum, Esq.
404 North Pine Street
Warsaw, North Carolina 28398

Audio Operator:                    CLERK'S OFFICE PERSONNEL

eScribers, LLC
7227 N. 16th Street
Suite 207
Phoenix, AZ 85020
800-257-0885
www.escribers.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiff: | | | | | |
| Anthony Little | 3 | 10 | | | |

www.escribers.net | 800-257-0885

Anthony Little - Direct

P R O C E E D I N G S

THE CLERK:  All rise.  This honorable U.S. District Court for North Carolina is now in session.  The Honorable Robert Jones, Jr. presiding.  Please be seated and come to order.

THE COURT:  All right.  Are the parties ready to proceed with Mr. McMillan's case?

MR. LUDLUM:  The defense is, Your Honor.

MR. VAN TRIGT:  Government is, Judge.

THE COURT:  All right.  I'll hear first from the Government.

MR. VAN TRIGT:  Judge, the Government would call Agent Anthony Little.

PLAINTIFF'S WITNESS, ANTHONY LITTLE, SWORN

DIRECT EXAMINATION

BY MR. VAN TRIGT:

Q.   Good morning, Agent Little.  Can you please state your name for the Court?

A.   Anthony Little.

Q.   And can you tell the Court how you're employed?

A.   Through Robeson County Sheriff's Office.  Also, I'm a task force officer ATF.

Q.   And can you tell the Court a little bit about your training experience as a law enforcement officer?

A.   Training experiences, I've had extensive training as far

www.escribers.net | 800-257-0885

as criminal activity involving anything from B&Es to robberies, gun violations, things of that nature.

Q. How long have you been a law enforcement officer?

A. Twenty-six years.

Q. Okay. Has that all been with the Robeson County Sheriff's Office?

A. Yes, I had a short stint with a license (indiscernible) bureau with E&B in '05.

Q. And you also stated that you were a task force officer with the ATF, is that correct?

A. That's correct.

Q. How long have you been in that position?

A. Since December of '19.

Q. Agent Little, are you familiar with the investigation into this defendant, Brandon McMillan?

A. Yes.

Q. Stemming from an incident that occurred on January 19th of 2017?

A. Yes.

Q. Can you tell the Court a little bit about that?

A. Brandon was involved in a situation with four other co-defendants, at which time they had made a plan to rob an individual by the name of Donald Preston Chavis. Donald Preston was a known drug dealer. At which time he was called up by phone to meet at a location on Tucker Road. He arrived.

Anthony Little - Direct

At that point Brandon and other co-defendants were lying in wait. When he started to leave the location, the car was stopped on the roadway. Brandon's position was in front of the vehicle. Where I believe it was three individuals inside Donald Chavis's vehicle. The driver, they were ordered to stop. I think he revved the motor. At which time, Brandon took what was believed to be an AR, assault rifle, and fired two rounds into the hood of the vehicle, disabling the vehicle from moving.

Q. And was one of those, I guess co-defendants or co-conspirators in that incident a Sean McMillan?

A. Yes.

Q. Is that any relation to this defendant, Brandon McMillan?

A. I have no idea.

Q. After Mr. McMillan fired into the engine block, what happened after that?

A. After that, some things were removed from Donald Preston's pers -- personal body, I think some jewelry and other items. Then the individuals, you know, turned and left the scene. I think Brandon and some other co-defendants left together, one co-defendant took off running in another direction where he later dropped a firearm there at a residence in the yard.

Q. And was Mr. Chavis shot during this encounter?

A. Yes, he was shot in the head.

Q.   I'm sorry?

A.   He was shot in the head.

Q.   And did he survive that shooting?

A.   No, he was deceased.

Q.   After that shooting, were crime scene investigators called out to process the scene?

A.   Yes.

Q.   Did they collect any evidence on scene?

A.   There was evidence collected.

Q.   And what, if anything, were some of the items that were collected?

A.   Not sure on what all items were collected but I know that the two shell casings that were fired from Mr. McMillan's firearm were located just in front of the -- where he said he was at.

Q.   And were there any narcotics located in the vehicle?

A.   I'm not sure.

Q.   Okay.  And throughout the investigation by the, I guess, Robeson County Sheriff's Office, did they end up making arrests and interviewing some co-conspirators in this?

A.   Yes, they do.

Q.   Was one of those co-conspirators of Sean Oxendine (ph.) or do you recall?

A.   I don't recall a Sean.  I think it was a Thomas Oxendine.

Q.   Sean McMillan, excuse me.

A.   Oh, Sean McMillan.

Q.   I'm sorry.  Sean McMillan.  I'm sorry.

A.   Yes, he was interviewed.

Q.   What, if anything, did he say?

A.   I'm not sure what Sean's statement entailed.

Q.   Okay.  At some point was Mr. Brandon McMillan, this Defendant, arrested on this charge?

A.   Yes.

Q.   And did he give a statement to law enforcement?

A.   Yes.

Q.   What, if anything, did he say?

A.   He indicated what I indicated to you, that also before the robbery, they had went to a particular subject's residence, a Matthew Harden (ph.), and obtained two weapons from him.  One was being the AR, other was being the 45 caliber pistol that was located at a residence yard later on.

Q.   And did Mr. McMillan admit to shooting the engine block in the vehicle and disabling it?

A.   Yes, he did.

Q.   And did he admit to being present during the robbery of Mr. Chavis?

A.   Yes.

Q.   Did he admit to having a firearm during that time?

A.   Yes.

Q.   Were the shell casings that were recovered on scene from

www.escribers.net | 800-257-0885

the weapon that Mr. McMillan fired reviewed by anyone

specialized in -- or specialized in ammunition by the ATF?

A.    Yes.

Q.    And what, if anything, did they determine after looking

at that ammunition?

A.    They were found to travel interstate next.

Q.    Are you aware if this defendant's been convicted of a

felony offense?

A.    Yes.

Q.    After Mr. McMillan was arrested for this offense, he was,

I guess, subsequently released from custody.  Is that correct?

A.    Yes, in October 2020 he was released.

Q.    And since he was released from custody, have you been

familiar with any other investigations into this defendant?

A.    Yes.

Q.    And can you tell the Court just a little bit about those?

A.    Of what I've been familiar with is the sale of narcotics.

Q.    And is that from your conversations, I guess, with other

individuals in the Robeson County Sheriff's Department?

A.    Yes.

Q.    When this defendant was arrested on this federal

indictment, I believe, on November 22nd of this year; is that

correct?

A.    That's correct.

Q.    Did you have a chance to interview him?

Anthony Little - Direct

A.   We did.

Q.   Did you read him his Miranda rights and did he waive those rights?

A.   Yes.

Q.   Can you tell the Court what, if anything, he told y'all?

A.   In the interview, Brandon spoke about having knowledge of narcotics coming in from -- into the County of Robeson from subjects out of Mexico.  He also indicated that he was making purchases from a known individual sells -- who sells narcotics there in the county that he was buying, you know, one or two ounces every other day from this individual.

Q.   And was that substance being cocaine?

A.   Yes, believed to be cocaine.  He said powder.

Q.   All right.  During that interview, did he ever admit to selling narcotics?

A.   Yes.

Q.   And was there any information gathered by yourself or other individuals with the Robeson County Vice Narcotics Unit that he was utilizing other individuals to sell narcotics for him?

A.   Yes, we had information that he was -- he was using what was believed to be juveniles to sell.  At the particular residence where he was.

Q.   In that particular residence, did the vice narcotics units actually conduct a controlled purchase of narcotics from

that residence?

A.   Yes, they did.

Q.   And was that from this defendant or for someone else?

A.   Someone else.

Q.   And was that someone else a young person or juvenile?

A.   Yes.

MR. VAN TRIGT:  Those are my questions for Agent Little.

THE COURT:  All right.  Mr. Ludlum?

MR. LUDLUM:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LUDLUM:

Q.   Agent Little, let's clear up the gun situation here, if we could.

A.   Okay.

Q.   You interviewed Mr. McMillan after this, excuse me, Mr. McMillan was interviewed after this 2017 shooting and you say admitted to some law enforcement officer that he shot an AR into the engine block of this car.  Is that right?

A.   Correct.

Q.   He never admitted to possessing the .45, did he?

A.   I think he indicated that they had went to this subject's residence, Matthew Hardon, and obtained the .45 and the AR.

Q.   So I'm understanding, the group as a whole obtain the .45 and the AR?

www.escribers.net | 800-257-0885

A.    Right.  He was -- he was with -- during this time, from my understanding, he was with Sean and Lucius (ph.) --

Q.    Okay.

A.    -- when they went to get the firearms.

Q.    But he specifically admitted I had the AR and shot it into this car?

A.    Yes.

Q.    Is that right?  Okay.  He's not charged with possessing the AR, is he, to your knowledge?

A.    No.  That AR was -- he said he actually buried it.  I think it was found by someone and supposedly sold in South Carolina.

Q.    So you all don't have that AR?

A.    We don't have that AR.

Q.    Any fingerprints done on the .45 that was found?  Fingerprint analysis?

A.    I'm not sure.  Not that I know of.

Q.    Not that you know of?  Okay.  As far as ballistics that were done on the bullet that was fatal, the fatal shot, were there any ballistics done to try to tie that to a particular firearm?  Do you know?

A.    I have no idea.  I'm sure if -- if one was found, they would have sent it to the SCI lab but I have no idea.

Q.    So you don't know if the evidence shows that it was actually a 9mm bullet that killed this gentleman instead of

www.escribers.net | 800-257-0885

the AR?

A.   Right.

Q.   You don't know that?

A.   I do not know that but according -- from the angle of the gunshot wound and the angle that Brandon said he shot, the evidence there just doesn't line up for the AR to be the weapon that killed --

Q.   Okay.

A.   -- the young man.

Q.   So you don't know about ballistics but you can say, based on your review of the evidence, that it was not the AR that killed this man, based on what you've seen?

A.   Based on what the angles is what I believe.

Q.   That is was not the AR that killed him?

A.   Right.

Q.   Okay.  Thank you.  So during the course of that investigation, Brandon did cooperate and give a full statement, is that correct?

A.   I think after some time, other individuals were arrested and I think Brandon later contacted the agent that was handling the case and I requested to speak with him.

Q.   Okay.  And Brandon's been in, I guess, the Robeson County Jail from 2017 up to about 2020.  Is that right?

A.   Right.  October 2020.

Q.   And you say he got out in October of 2020 and you got

evidence --

A.    Yes, sir.

Q.    -- from other sources that he was engaged in drug trade. Is that right?

A.    That's correct.

Q.    No charges have come from any of that thus far have they?

A.    No, sir.

Q.    Okay.  No arrests of Brandon for that?

A.    No, sir.

            MR. LUDLUM:  Those will be my questions, Your Honor.

            THE COURT:  Any redirect?

            MR. VAN TRIGT:  No, sir.

            THE COURT:  Thank you, sir.  You can step down.

            Any further from the Government?

            MR. VAN TRIGT:  No, sir, not from the Government.

            THE COURT:  All right.

            Mr. Ludlum, hear from the defense?

            MR. LUDLUM:  Your Honor, after conferring with my client, I think he would elect not put on any evidence and would waive any further hearings in this case.

            THE COURT:  So he's way -- is he just not wishing to be heard?

            MR. LUDLUM:  No, he is waiving and is submitting to detention at this point.

            THE COURT:  Okay.

www.escribers.net | 800-257-0885

Anthony Little - Cross

Is that right, Mr. McMillan?

MR. LUDLUM:  Stand up.

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  You understand, sir, that you have the right to have a hearing on this issue?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you understand I have made -- I haven't made a decision yet on this issue.  You understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  And do you understand if you waive your right to this hearing and if I accept that waiver, that you'll be detained and held in custody of the Marshal's Service until your trial in this case.  You understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Has anyone made any threats or promises to you to get you to waive your right to the hearing?

THE COURT:  No, sir.

THE DEFENDANT:  Is your decision to waive the hearing in this case, is that your knowing and voluntary choice?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.

Mr. Ludlum, you've discussed the issue of waiver with your client?

MR. LUDLUM:  I have, Your Honor.

www.escribers.net | 800-257-0885

Anthony Little - Cross

THE COURT: And your satisfied Mr. McMillan knows and understands his right to the hearing?

MR. LUDLUM: He does, Judge.

THE COURT: And that he's making a knowing and voluntary choice of waiving his right to that hearing?

MR. LUDLUM: Yes, sir.

THE COURT: All right.

I find Mr. McMillan has waived his right to the detention hearing knowingly and voluntarily. I accept his waiver to that hearing and direct that he be remanded to custody of Marshal's Service pending further proceedings in this case.

Anything further regarding Mr. McMillan?

MR. LUDLUM: May I approach with this, Your Honor?

THE COURT: Yes, sir.

MR. VAN TRIGT: Not from the Government.

MR. LUDLUM: Not from us either.

THE COURT: All right. Thank you very much.

(Court is adjourned)

* * * * *

www.escribers.net | 800-257-0885

CERTIFICATE OF TRANSCRIBER

I, Jennifer A. Valentine, court-approved transcriber, in and for the United States District Court for the Eastern District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 22nd day of June, 2023.

/s/ _____

JENNIFER A. VALENTINE

COURT-APPROVED TRANSCRIBER

www.escribers.net | 800-257-0885